UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAURICIO REYES HERNANDEZ, AR7908,

Petitioner,

v.

ROSEMARY NDOH, Warden,

Respondent.

Case No. 17-cv-06769-CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner, a state prisoner incarcerated at Avenal State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a criminal judgment from Santa Clara County Superior Court on the ground that the trial court improperly excluded impeachment evidence that the complaining witness/victim had stolen and unlawfully used his son's social security information. For the reasons that follow, the petition will be denied.

## BACKGROUND

A. <u>Statement of the Case</u>

On October 28, 2013, the superior court sentenced petitioner to 31 years in state prison after a jury convicted him of four counts of forcible rape of his girlfriend, one count of inflicting corporal injury on a cohabitant and one count of making criminal threats. The jury also found that petitioner personally inflicted great bodily injury on his girlfriend when he committed one of the rapes and when he inflicted corporal injury on her.

On April 25, 2016, the California Court of Appeal affirmed the judgment of the superior court and, on July 13, 2016, the California Supreme Court denied review. Petitioner also sought habeas relief from the state courts until the California Supreme Court denied his final habeas petition on November 21, 2017. He then filed the instant action for federal habeas relief.

On February 13, 2018, the court found that the two claims in the petition – (1) ineffective assistance of trial counsel for failing to investigate material witnesses and evidence, and (2) improper exclusion of impeachment evidence – appeared cognizable under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent instead moved to dismiss the petition for failure to exhaust state judicial remedies as to claim (1).

On July 30, 2018, the court granted respondent's motion to dismiss because petitioner only properly exhausted claim (2) and, under the law of the circuit, gave petitioner the option of either withdrawing his unexhausted claim and proceeding only on his exhausted claim, or of dismissing the entire mixed petition and returning to federal court with a new petition once all claims are exhausted. Petitioner elected to delete the unexhausted claim.

On September 7, 2018, the court ordered respondent to show cause why a writ of habeas corpus should not be granted on petitioner's exhausted claim of improper exclusion of impeachment evidence. Respondent filed an answer to the order to show cause, but petitioner did not file a traverse.

B.     Statement of the Facts

The California Court of Appeal summarized the facts of the case as follows:

> ***Prosecution Case***
>
> Blanca Doe, the victim in this case, started dating defendant in the summer of 2010. They were both divorced and had children from prior marriages. In November or December 2010, defendant moved into Blanca's four-bedroom apartment. Defendant paid rent and had his own bedroom. Blanca and her seven-year-old daughter shared a bedroom; Blanca's 14-year-old son had his own room. Another couple and their baby rented the fourth bedroom from Blanca. Defendant worked as a truck driver and typically spent two or three nights a week in Blanca's apartment. Blanca, who was undocumented, worked at a gas station convenience store.
>
> At trial, Blanca described five incidents of violence involving defendant. Two occurred before defendant moved into her apartment; three occurred after he moved in. In four of the five incidents, defendant raped Blanca. After the fifth incident, Blanca called the police.
>
> **First Violent Incident**
>
> After defendant became Blanca's boyfriend, they had consensual sex on a regular basis. Early in their relationship, Blanca got pregnant, then had a miscarriage. After that, Blanca insisted that defendant wear a condom when they had sex because she did not want another child. Defendant did not like wearing a condom. Blanca testified that defendant wanted to have a child with her and was unhappy that she did not want another child.

Before defendant moved in, Blanca had discovered that defendant had taken nude photos of her without her consent. They argued about the photos after Blanca saw them on defendant's cell phone. Blanca asked defendant to leave and threw the phone at him; the phone landed on the floor and broke. Defendant got upset and grabbed Blanca by the neck. Blanca's son walked in and defendant let her go. (The prosecution did not file any criminal charges arising out of this incident.)

**First Three Sexual Assaults**

A few days after defendant grabbed Blanca by the neck, he had knee surgery. Blanca let him stay in her son's room while he recuperated. One day, defendant accused Blanca of cheating on him. He said he wanted to have sex, but she said, "no." He pushed her onto the bed, tore her clothes off, and penetrated her vagina with his penis. Blanca testified that even with his knee "bandaged," defendant was stronger than she was.

Blanca thought about calling the police after defendant sexually assaulted her, but she decided not to because she feared she might lose her children. Blanca was a victim of domestic violence by her ex-husband, who grabbed her by the neck and choked her in front of their daughter in 2008. As a result of that incident, Blanca's ex-husband was convicted of spousal battery (§§ 242, 243, subd. (e)) in January 2009. Protective services got involved and a social worker told Blanca that if she could not provide a safe environment for her children, the children would be taken away from her. The social worker made weekly visits to Blanca's home for six to eight months.

Blanca had to get up early to go to work and defendant often got home late. After defendant moved in, Blanca cooked for him, but because of the differences in their schedules, they usually did not eat together. They also did not sleep together.

One night in December 2010, after Blanca and her children had gone to bed, Defendant came to her room and asked if they could talk. She went to his room and they "argued over the . . . same old thing." He wanted to have dinner with her and wanted her to share his bed; she did not want those things. Defendant became angry. She tried to leave, but defendant pushed her on the bed and said she was going to sleep with him. She said, "no," told him she did not want to have sex, and tried to leave again. He threw her on the bed and said, "'like it or not you're gonna sleep with me.'" He tore her clothes off and put his penis in her mouth, knowing she "didn't like that." He also put his penis in her vagina. At some point, he slapped her.

On another occasion, defendant came home during the day and complained that Blanca had not done his laundry. He called her to his room and she agreed to wash his clothes. He closed the door, said he wanted to be with her, pushed her onto the bed, and forced her to have sex. She told him she did not want to have sex with him. Defendant penetrated her vagina with his penis.

During one of the first three rape incidents, defendant grabbed Blanca by the neck or her shirt. Blanca testified that on each of those occasions, defendant forced her to have sex and did not wear a condom. When they had consensual sex, she insisted he wear a condom. After each incident, defendant apologized to Blanca, asked her forgiveness, and promised to change. She believed him when he said he would change.

3

### Fourth Sexual Assault on February 25, 2011

The final rape incident occurred on February 25, 2011. By that time, Blanca had told defendant she wanted to end their relationship and had asked him to leave her apartment. That evening, Blanca went to the local recreation center to exercise. Since she had to get up at 3:00 a.m. to go to work, she arranged for her children to spend the night with a girlfriend. She also made arrangements for defendant to pick up her son from the recreation center at 10:00 p.m. and to take her son to her friend's house. When Blanca left the recreation center, her daughter was already at her friend's house.

Blanca got home around 9:00 p.m. and took a shower. She had locked the bathroom door, but while she was showering, defendant unlocked the door with a knife and went into the bathroom. Blanca asked him to leave and they started arguing. Defendant did not like it when Blanca went to the recreation center. He yelled at Blanca and accused her of cheating on him. Blanca told him to get out and "let [her] shower in peace." She said they could talk after she finished her shower. Defendant left the bathroom. Blanca lingered in the shower to avoid him.

After her shower, Blanca went into her bedroom to change. She locked the door behind her. Defendant unlocked the door and came in. Defendant told her he did not want to move out of the apartment and they started arguing. He said she probably wanted him to move out because she was seeing someone else. Although she was not seeing anyone else, Blanca angrily said she was seeing someone and told defendant to leave. Defendant grabbed her by the neck with one hand; he squeezed "very hard" and "put" her on the bed. They struggled. Blanca was able to loosen his grip and kicked him. Defendant grabbed her by the feet, pulled her across the bed, and then grabbed her by the throat again. Defendant called Blanca a "whore." He said he was leaving her and would kill her before he left. He said he wanted her to be with him. She asked him to leave her alone and "to break up in peace."

Defendant blocked the door and they continued to struggle inside Blanca's bedroom. He grabbed her by the neck again. They were on the bed and he put his body weight on top of her. She was able to loosen his grip a second time. He tried to grab the hand she was using to defend herself and she scratched him. He punched her on the side of her face, near her mouth. He grabbed her by the throat a third time, "very, very strong[ly]." Blanca thought she was losing consciousness and was afraid she was going to die. She was having trouble breathing and saw darkness. Defendant kept one hand on her throat. Meanwhile, he unzipped his pants and put his penis in her vagina. He kept choking her as he penetrated her.

Defendant stopped raping Blanca when the telephone rang, but he did not let Blanca answer the phone or let her go. Blanca assumed it was her son calling; moments later, her son called defendant on his cell phone. Defendant answered his cell phone and let Blanca go. After he spoke to Blanca's son, Defendant apologized to Blanca, asked her forgiveness, and promised to change. He then left to pick up Blanca's son.

### 911 Call and Police Investigation

Blanca called 911 right after defendant left. She reported that her boyfriend had grabbed her by the neck and choked her, and she asked the dispatcher to send the police to her home. She did not

4

report that she had been raped.

The jury heard the 911 recording. Since Blanca spoke Spanish, the dispatcher had to get a translator on the line. The 911 call is somewhat chaotic. While Blanca was on the phone with the 911 dispatcher, defendant returned briefly, stating that he could not find her son. Blanca sent him back to the recreation center.

Police Officer Ray Ramos arrived five minutes after Blanca called 911. Officer Ramos speaks Spanish and was able to communicate directly with Blanca. Officer Ramos wore a body camera and recorded what Blanca told him about the assault. The jury heard the recording and read an English-language translation of what was said.

When Officer Ramos arrived, Blanca was in her living room. She was crying, nervous, and looked scared. Officer Ramos observed visible injuries on Blanca: (1) she had red marks on her face and neck, (2) her face, neck, and throat were swollen; and (3) she had a cut on the inside of her lip. Her voice was raspy and she was coughing. Blanca complained of pain in her neck and on the left side of her face, and stated that her throat was very dry. At one point, Blanca went into the bathroom and vomited.

Officer Ramos asked Blanca several times whether defendant lived with her. Blanca said, multiple times, that he did not live with her. Instead, Blanca told Officer Ramos: (1) they had been dating for five or six months, but they did not live together; (2) they do not live together; (3) she did not know where defendant lived, but sometimes he stays with her; (4) defendant wanted them to live together but she was not ready to live with him; (5) she did not know where he lived, he was renting a room "here," but he left; and (6) she was letting him leave "his stuff" in her apartment. Blanca stated that she could not have more people in her apartment because the manager is strict about the number of people that live there.

Later in the interview, Blanca told Officer Ramos she had lied to him and admitted that defendant lived with her. Blanca told the officer that her building manager had told her that if she rents a room to someone who causes trouble with the police she would be in danger of losing her apartment.

Blanca told Officer Ramos defendant had been violent before and this was the fourth time he had forced her to have sex with him. Her testimony at trial was consistent with what she had told Officer Ramos on the night of the incident.

Officer Ramos arranged for Blanca to be examined by paramedics at the scene. After the paramedics cleared Blanca for transport, Officer Ramos took Blanca to the hospital, where a SART (Sexual Assault Response Team) nurse examined Blanca.

**SART Examination and Further Investigation**

SART Nurse Sandra Amaral testified at trial. She described Blanca as tearful, somber, and withdrawn during the SART exam. Nurse Amaral noted that Blanca's lips were swollen and that she had an abrasion on the inside of her lip, which was consistent with her history of being hit in the face. Blanca had circular-shaped bruises and redness in three areas on her throat and smaller crescent-shaped abrasions on her neck that appeared to have been caused by fingernails grabbing her throat. Blanca had an impression of a hand on her face, scratches on her right shoulder, and an abrasion on her left chest wall. Blanca also had injuries (redness and abrasions) to

5

her vagina that were consistent with penetration. Here injuries in that area were of the type commonly seen in rape cases. On cross-examination, Nurse Amaral stated that Blanca's vaginal injuries could have occurred with sexual intercourse that is not rape. Defendant's semen was present on a vaginal swab Nurse Amaral obtained from Blanca.

Defendant was examined by a SART nurse at 12:45 a.m. on February 26, 2011. He had a four-centimeter long, scratch-like bruise on his left chest. The nurse swabbed defendant's penis. Blanca's DNA and defendant's semen were on the swab.

Detective Luis Espejo spoke with Blanca at the hospital. He took follow-up photos of Blanca's injuries three days later. At that time, he saw bruising on her ankles. He also saw injuries to her neck and swelling on her left cheek.

In March 2011, Blanca received a letter that was signed by Luis Villalobos. Blanca did not know Villalobos. The letter mentioned Blanca's relationship with defendant, urged her to forgive defendant, and contained personal information regarding her sister's medical condition. The letter said defendant would help pay for her sister's cancer treatment if Blanca dropped the charges against him. The letter advised Blanca that she could not be forced to testify and urged her to refuse to testify against defendant. Blanca gave the letter to Detective Espejo, who recognized the return address as the county jail. He investigated and determined that Villalobos was housed in the same jail pod as defendant.

*Defense Case*

In his defense, defendant argued that he had consensual sex with Blanca and that Blanca fabricated the rape allegations to obtain legal resident status through the U-Visa program.

Defendant presented expert testimony from Richard Hobbs, an immigration attorney, regarding the U-Visa program. The U-Visa is a four-year, non-immigrant visa for undocumented persons who meet four requirements. The person must: (1) be a victim of a qualifying crime; (2) prove that he or she assisted in the prosecution or investigation of the crime; (3) show that his or her assistance is likely to be helpful in the prosecution or investigation of the crime; and (4) suffer substantial mental or physical harm. The qualifying offenses are generally serious or violent crimes. They include domestic violence and rape, but not simple battery. The purpose of the U-Visa program is to encourage undocumented crime victims to come forward, so crimes will not go unaccounted for.

The benefits of the program to crime victims are substantial. The moment an application is mailed, the applicant becomes eligible for federal benefits, including CalWorks, food stamps, and Medi-Cal. Upon approval of a four-year work permit, the person becomes a resident, can apply for a driver's license and social security number, and is legally authorized to work for over 26,000 companies that use the e-verify system. After three years, the U-Visa applicant may apply for a green card and be on the path to citizenship. The person's minor children can also apply for derivative U-Visa status.

U-Visa applicants demonstrate eligibility for the program by obtaining a certification from a law enforcement agency or the district attorney. The certification satisfies the first three requirements for the program. The United States Citizenship and

> Immigrations Services adjudicates the fourth requirement (whether the applicant has suffered substantial mental or physical harm). Prosecution and conviction of the offender are not necessary to obtain a U-Visa. Applicants do not have to return to their home countries and do not risk deportation while their applications are pending.
> Blanca first became aware of the U-Visa program in late 2008, after her ex-husband was charged with spousal battery. A social worker told her she was eligible to apply since she was the victim of domestic violence. The social worker referred Blanca to Catholic Charities, where she met with an immigration attorney. Blanca did not pursue the U-Visa application at that time because she could not afford the $2,500 legal fee. When asked on cross-examination whether the attorney had told her the injuries inflicted by her ex-husband were not serious enough to "guarantee" the U-Visa, Blanca initially answered "yes." Moments later, she testified that the attorney had said her case was "serious" and she had a "great possibility" of obtaining the U-Visa.
> After her SART examination in February 2011, a victim witness advocate from Community Solutions contacted Blanca. Two months later, Blanca started receiving counseling at Community Solutions. Blanca's counselor suggested she apply for a U-Visa based on the sexual assaults in this case. Community Solutions had a U-Visa program with a lower cost ($300) than Catholic Charities.
> Blanca attended two workshops about the U-Visa at Community Solutions. In early 2013, she submitted a U-Visa application. Detective Espejo prepared a U-Visa certification for Blanca at the request of Community Solutions. In his certification, Detective Espejo reported that Blanca was a victim of domestic violence, but did not state that she had been raped.
> Blanca's ex-husband testified on behalf of defendant. In March 2012, he told a defense investigator that Blanca had asked him for money to retain an attorney to "fix" her immigration status. At trial, however, he denied making that statement. He testified that Blanca had asked him to help her financially, but the money was for their children. He testified that he did not pay child support. Although he did not give Blanca any money, he would occasionally buy things for their children. He also told the investigator Blanca was honest.

People v. Hernandez, No. H040444, slip op. at 2-11 (Cal. Ct. App. Apr. 25, 2016) (footnotes omitted) (Answer Ex. F).

## DISCUSSION

A. Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

7

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

B. Claim & Analysis

Petitioner claims that the trial court violated his federal constitutional rights when it excluded impeachment evidence that Blanca had stolen and unlawfully used his son's social security information. According to petitioner, Blanca's alleged theft showed that she was not credible and that her motive in falsely accusing him of rape was to obtain a U-Visa.

The California Court of Appeal summarized the facts pertaining to the trial court's ruling excluding the proffered impeachment evidence as follows:
> Both parties filed written motions in limine. Defendant argued in limine that he was "entitled to attack [Blanca's] credibility with all relevant impeaching evidence," including Blanca's efforts to obtain "legal immigration status through a U-Visa." Defendant

8

asserted that Blanca had a motive to falsely accuse him of rape to obtain a U-Visa.

The prosecution expected defendant to attempt to impeach Blanca with (1) evidence regarding her U-Visa application; and (2) evidence that she "used false social security information to gain employment." The prosecutor therefore made a motion in limine to exclude both types of evidence. The motion stated that Blanca had "been living in the United States as an undocumented worker for at least a decade," had no criminal record, "had a history of gainful employment," and supported her children. The prosecution argued that "being an illegal immigrant often requires people to engage in some type of subterfuge" to make a living. The prosecution cited a number of California civil cases and cases from other jurisdictions that have held that evidence of a witness's immigration status is not relevant to impugn credibility. The prosecution also argued that such evidence is highly prejudicial.

At the hearing on the motions, defendant asked the court to admit evidence that Blanca had stolen and used defendant's son's social security card.

Ruling on these motions, the court agreed that defendant could inquire about Blanca's effort to obtain a U-Visa and present expert testimony about the U-Visa process. But the court concluded, ". . . I don't think specific other instances where she has engaged in behavior . . . to stay in the country, submitting false documents here or doing other sorts of things here that are related to immigration will be helpful to the jury. [¶] The larger issue about whether or not she's fabricated or exaggerated to get a U[-]Visa, which is only valuable if you do not have illegal status [*sic*], are fair issues for the defense to explore, but not sharp shooting her about whether or not she submitted a false social security card at particular dates or times."

In response, defense counsel argued that the theft and use of the social security information was different from submitting false documents to obtain work because there was an "actual theft" and a "known victim." The court responded: "I don't know that I'm prepared to say that every illegal status person that has used documents not their own to maintain employment to support their family is a person of questionable moral turpitude. . . . I don't think the defendant will be deprived of his most important issue here as to whether or not she's exaggerating or fabricating in order to . . . remain in the country. [¶] I don't think the fact that . . . she also did some other things is helpful. It's all about her wanting to stay in the country, which is a good issue and may provide a defense argument about exaggeration or fabrication. . . . And accordingly, my guidance to you at this point is the U[-]Visa is important but not facts taken about those [other] efforts . . . ."

Defense counsel argued that Blanca's alleged theft of the social security card is "a crime that goes to moral turpitude and to credibility and to her motives and benefits by lying and engaging in theft." The court repeated its conclusion that the U-Visa is an "important issue and the defense is allowed to inquire [as] to that, but not as to the dozens of things that might otherwise be illegal that every undocumented person does to try to remain in the country until they can attain legal status."

People v. Hernandez, slip op. at 11-13.

The California Court of Appeal concluded that the trial court did not abuse its discretion by excluding the proffered impeachment evidence and that petitioner was not prejudiced by the trial court's ruling because "it is not reasonably probable that a result more favorable to defendant would have been reached if the jury had heard the additional evidence about the alleged theft of the social security information." Id. at 17 (citing People v. Watson, 46 Cal. 2d 818, 836 (1956)). The court of appeal also specifically rejected petitioner's claim that the exclusion of the evidence "violated his federal constitutional rights to confront prosecution witnesses and present a complete defense." Id. at 17.

It is well established that the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish. Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Trial judges retain wide latitude to impose reasonable limits on cross-examinations based on concerns about, among other things, "harassment, prejudice, confusion, of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). A defendant consequently establishes a violation of the Confrontation Clause only if "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had [he] been permitted to pursue his proposed line of cross-examination." Id. at 680.

It is similarly well established that a violation of the federal constitutional right to present a complete defense does not occur any time that relevant and material evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal citation and quotation marks omitted). See, e.g., Nevada v. Jackson, 569 U.S. 505, 511 (2013) (no Supreme Court decision clearly establishes that exclusion of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility because the evidence may confuse the jury, unfairly embarrass the victim, surprise the prosecution or unduly prolong the trial, violates the Constitution).

A violation of the federal constitutional rights to confront prosecution witnesses or to present a complete defense merits federal habeas relief only if the error had a "substantial and

10

injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). See Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009) (applying Brecht to claims of violation of Confrontation Clause); Lunbery v. Hornbeam, 605 F.3d 754, 762 (9th Cir. 2010) (applying Brecht to claims of violation of right to present a defense).

Petitioner's claim that that the trial court violated his federal constitutional rights to confront prosecution witnesses and to present a complete defense when it excluded impeachment evidence that Blanca had stolen and unlawfully used his son's social security information is without merit because it cannot be said that any constitutional error from the exclusion of said evidence had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

The California Court of Appeal properly observed that "there was ample evidence relating to Blanca's credibility." People v. Hernandez, slip op. at 16.

> When cross-examining Blanca, defense counsel presented evidence that Blanca lied to Officer Ramos at least four times when asked whether defendant lived with her. Defense counsel reinforced this point in the cross-examination of Officer Ramos, and the jury had a transcript of Officer Ramos's interview of Blanca. The jury heard evidence that Blanca was not forthright with her landlord about the number of people who lived in her apartment. Defendant's evidence included a copy of Blanca's lease, which prohibited subleasing. It also included Blanca's admission on cross-examination that she had not added others who lived with her to the lease, even though she collected rent from them. The jury knew Blanca was undocumented and worked here illegally.

Id. at 16-17. The court of appeal also properly observed that petitioner "was allowed to present evidence that Blanca had motive to lie about the rapes to obtain a U-Visa." Id. at 17.

> Blanca admitted she knew about the U-Visa program and its benefits in early 2009, one year before she met defendant. When Blanca called 911, she reported that she had been choked, but did not say she had been raped. In addition, Blanca had been warned by a social worker that she might lose her children if she did not provide a safe environment for them. Knowing this, Blanca permitted defendant to move into her apartment after he grabbed her neck and had already raped her once. And on February 25, 2011, she allowed defendant, who had just choked her violently and raped her, to pick up her son. These facts reflect poorly on Blanca's credibility. Defense counsel presented a vigorous defense and argued each of these points to the jury in her closing argument.

Id. In view of this record, this court is satisfied that the exclusion of the proffered impeachment evidence that Blanca had stolen and unlawfully used petitioner's son's social security information

11

did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. And pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because it cannot be said that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS SO ORDERED**.

Dated: May 1, 2019

_____
CHARLES R. BREYER
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICIO REYES HERNANDEZ,<br>　　　　Plaintiff,<br>　v.<br>ROSEMARY NDOH,<br>　　　　Defendant. | Case No. 3:17-cv-06769-CRB<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 1, 2019, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Mauricio Reyes Hernandez ID: AR 7908
Avenal State Prison 330-14-1 Low
PO Box 903
Avenal, CA 93204

Dated: May 1, 2019

　　　　　　　　　　　　　　　　　Susan Y. Soong
　　　　　　　　　　　　　　　　　Clerk, United States District Court

　　　　　　　　　　　　　　　　　By:_____
　　　　　　　　　　　　　　　　　Lashanda Scott, Deputy Clerk to the
　　　　　　　　　　　　　　　　　Honorable CHARLES R. BREYER